UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| WENDY A. SPURGEON, Natural Mother on Behalf of K.M., a Minor, | : | Case No. 1:09-cv-430 |
| Plaintiff, | : | Chief Judge Susan J. Dlott<br>Magistrate Judge Timothy S. Black |
| vs. | : | |
| COMMISSIONER OF SOCIAL SECURITY, | : | |
| Defendant. | : | |

**REPORT AND RECOMMENDATION[1] THAT:(1) THE ALJ'S NON-DISABILITY FINDING BE FOUND SUPPORTED BY SUBSTANTIAL EVIDENCE, AND AFFIRMED; AND (2) THIS CASE BE CLOSED**

This is a Social Security disability benefits appeal. At issue is whether the administrative law judge ("ALJ") erred in finding K.M. "not disabled" and therefore unentitled to supplemental security income ("SSI"). (*See* Administrative Transcript ("Tr.") (Tr. 20-34) (ALJ's decision)).

**I.**

On March 31, 2004, Wendy Spurgeon filed an application for supplemental security income ("SSI") on behalf of her daughter K.M., due to attention deficit hyperactivity disorder, speech deficit, and learning disabilities. (Tr. 75-77, 23).

---

[1] Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendation.

Upon denial of K.M.'s claims on the state agency levels, Plaintiff requested a hearing *de novo* before an ALJ. (Tr. 41-44, 48-50). A hearing was held on January 23, 2007, at which Ms. Spurgeon appeared, with K.M.'s attorney, and testified. (Tr. 494-505). The ALJ held a second hearing on April 10, 2007, at which K.M. appeared and testified, as did her mother, and an independent medical expert. (Tr. 506-545).

In June 2007, the ALJ entered his decision finding that K.M. was neither disabled nor entitled to benefits. (Tr. 20-34). That decision became the final determination upon denial of review by the Appeals Council. (Tr. 6-8).

K.M. was 9 years old (first grade) at the time she applied for SSI and 11 years old (fourth grade) at the time of the ALJ's decision. (Tr. 23, 498).

The ALJ's "Findings," which represent the rationale of his decision, were as follows:

1. The claimant was born on October 18, 1995. Therefore, she was a school-age child on March 31, 2004, the date the application was filed (20 CFR 416.926a(g)(2)).

2. The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 416.924(b) and 416.972).

3. The claimant has the following severe impairments: learning disability, speech and language impairment, and attention deficit hyperactivity disorder (ADHD) (20 CFR 416.924(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5. The claimant does not have an impairment or combination of impairments that functionally equals the listings (20 CFR 416.924(d) and 416.926(a)).

6. The claimant has not been disabled, as defined in the Social Security Act, since March 31, 2004, the date the application was filed (20 CFR 416.924(a)).

(Tr. 23-33).

In sum, the ALJ concluded that K.M. was not under a disability as defined by the Social Security Regulations and was therefore not entitled to SSI. (Tr. 34).

On appeal, Plaintiff argues that: (1) the ALJ erred in failing to adequately explain why K.M. did not meet or equal a listing; and (2) the ALJ erred in failing to make proper credibility findings as to school psychologists' and teachers' findings. The undersigned will address both assignments of error.

**II.**

The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In performing this review, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled. As the Sixth Circuit has explained:

> "The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts. If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm."

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The claimant bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). That is, she must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job in the national economy. 42 U.S.C. § 423(d)(1)(A).

**A.**

For her first assignment of error, K.M. claims that the ALJ erred in failing to adequately explain why she did not meet or equal a listing. For her second assignment of error, K.M. claims that the ALJ erred in failing to make proper credibility findings as to the school psychologists' and teachers' findings. The undersigned will review the assignments of error together.

The record reflects that:

In April 2000, K.M. was seen by psychologist's assistant Eckart Wallish, M.A. and psychologist Sherry Baker, Ph. D., on referral from Butler County Children Services regarding possible sexual abuse. (Tr. 142-146, 147-149). During the examination, K.M.

was not hostile, but she only answered questions sporadically and preferred to play with objects in the room. (Tr. 145). K.M.'s speech was difficult to understand during the interview due to her poor articulation, but she was most often able to make herself understood. (Tr. 143). K.M.'s overall intelligence was within the average range; her verbal skills were within the borderline to low average range, and her visual motor integration skills were well below the average range. (*Id*.) K.M. was diagnosed with a phonological disorder (*i.e.*, failure to use speech sounds appropriate for the individual's age and dialect). (Tr. 146). Ms. Lisa Dierling, social worker for the Butler County Children Services, opined that the evidence did not indicate that K.M. had been sexually abused. (Tr. 149).

In late 2003, K.M. underwent school-age testing and planning to determine what special education services were necessary. (Tr. 150-175). K.M. was in the first grade. (Tr. 152). The evaluator noted that K.M. was receiving speech and language services, but that she required further evaluation to assess for other disabilities. (*Id*.) Once all testing was performed, K.M. qualified for special education services for specific learning disability based on her academics, her performance on an individualized intelligence test, and her individual achievement test. (Tr. 175). Although K.M. was repeating the first grade at the time and was older than most first graders, she still performed well below the first grade level. (*Id*.) K.M. also qualified for speech and language services. (*Id.*) K.M. was diagnosed with specific learning disability and speech and language impairment. (*Id*.)

In March 2004, K.M. underwent a special education services periodic review, and the school's review team noted that K.M. had made progress in language therapy, but that her skills remained below level when compared to her peers. (Tr. 176). The review team noted that K.M. was easily distracted, often responded to questions with an off-topic comment, and frequently appeared restless and fidgety. (*Id.*) In spring 2004, K.M.'s overall performance on the Ohio Off-Grade Proficiency Tests was below proficiency standard. (Tr. 187).

In April 2004, Dr. Mark Blankenburg, K.M.'s physician, reported that he began treating K.M. in November 2000 and that he had diagnosed her with ADHD, combined, specific learning disabled, and speech deficit. (Tr. 189). Dr. Blankenburg reported that he had prescribed K.M. Adderall XR in March. (*Id.*) He noted that he had not had any negative feedback since starting K.M. on the medication and that he assumed she was doing well. (Tr. 190).

In May 2004, Amy Glaser, K.M.'s school psychologist, reported that K.M.'s concentration had notably improved and that her progress had improved as well. (Tr. 193). Ms. Glaser noted, however, that K.M. continued to work significantly below grade level. (*Id.*) Ms. Glaser also completed a report form wherein she opined that K.M.'s articulation skills were age-appropriate and that her prognosis was good. (Tr. 218). Ms. Glaser opined that K.M.'s weak vocabulary skills adversely affected her reading comprehension and that her weak phonemic awareness skills negatively impacted

her reading fluency. (Tr. 219). That same month, Ms. Kathy Locke, K.M.'s first-grade teacher, completed a questionnaire and reported that K.M. was doing better with acquiring and using information since being placed on medication for hyperactivity, but that she was still having problems. (Tr. 210-211). With regard to attending and completing tasks, Ms. Locke reported that K.M. was doing much better since being placed on medication. (Tr. 211). In the area of interacting and relating with others, Ms. Locke reported that K.M. had been placed with a one-on-one tutor for reading because of her attention span. (Tr. 212). Ms. Locke also noted that K.M. frequently missed school because her mother would not send her regularly. (Tr. 215).

In July 2004, psychologist Bob Stinson, Psy. D. reviewed K.M.'s records at the request of the state Disability Determination Services (DDS), and opined that while K.M.'s impairments were severe, she did not meet, medically equal, or functionally equal a listed impairment. (Tr. 220). Dr. Stinson opined that K.M. had less than marked limitations in: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and no limitation in her (6) health and physical well being. (Tr. 222-23). Dr. Stinson noted that Plaintiff was doing better with acquiring and using information since starting medication, and that most of Ms. Locke's ratings were in the 1 (no problem) to 3 (an obvious problem) range for the domain of interacting and relating with others. (Tr. 222).

In September 2004, Dr. Blakenburg noted during an examination that K.M. did well on Adderall, and that there was a noticeable difference when K.M. was not on medication. (Tr. 229). Dr. Blakenburg agreed to increase the dose of K.M.'s medication. (*Id*.) Two months later, Dr. Blakenburg reported that K.M.'s hyperactivity had improved with medication. (Tr. 227). Dr. Blakenburg also opined that K.M. did not have any behavior problems. (*Id*.)

In September 2004, Ms. Shashi Khanna, K.M.'s special education learning disability teacher, reported that K.M. was in an inclusionary learning type-setting with pull-out support for math. (Tr. 292). K.M. was also put in small work group settings at a slower pace and was given additional time to complete math assignments. (*Id*.) Ms. Khanna reported that K.M. needed re-direction even in small group settings. (Tr. 294). Ms. Khanna opined that K.M. sometimes had difficulty following multi-step directions, such that the steps needed to be broken down, but that K.M.'s medications seemed to help her. (Tr. 292). Ms. Khanna opined that K.M. was very friendly and eager to please others, got along well with peers, usually adjusted well to new situations or criticism, and did not have problems working with others in small group settings. (Tr. 293). Ms. Khanna opined that K.M. functioned independently for a child of her age. (Tr. 294).

That same month, Ms. Christine Endres, K.M.'s speech pathologist, completed a questionnaire, wherein she reported that K.M. was in regular education classes with learning disability support. (Tr. 296). Ms. Endres reported that K.M. needed additional

time to process and respond to information presented, which resulted in improved participation. (*Id*.) Ms. Endres opined that K.M.'s attention deficit and ability to maintain concentration and attention had improved since she was started on medication. (Tr. 296, 298). Ms. Endres reported that K.M. had below average receptive and expressive language skills, especially in her vocabulary skills and that K.M.'s work pace could be slow and that she needed encouragement. (*Id*.) Ms. Endres opined that K.M. interacted appropriately in small group settings, and that she functioned independently for a child of her age. (Tr. 297-98).

Ms. Glaser, the school psychologist, also completed a questionnaire, based on her memory of working with K.M. one year earlier, and reported that K.M. was working about one-year below grade level and had had attention problems and language delays. (Tr. 300). Ms. Glaser reported that K.M. was friendly, good-natured, and enjoyed talking and sharing experiences. (Tr. 301). Ms. Glaser reported that K.M. did not have any significant problems interacting with peers or establishing and maintaining personal friendships. (*Id*.) Ms. Glaser reported that K.M. could occasionally be impulsive and often needed to be redirected. (*Id*.) Additionally, K.M. sometimes needed repetition and re-explanation. (Tr. 302). Ms. Glaser reported that K.M.'s ability to maintain concentration and attention was much better with medication. (*Id*.) Ms. Glaser noted that K.M. had missed school frequently. (Tr. 303).

Ms. Kathy Locke, K.M.'s teacher, also completed a questionnaire in September 2004. (Tr. 392-95). Ms. Locke reported that K.M. did not have any speech, language, or

communication problems and that K.M. was a very loving child and related well to others. (Tr. 392-93).

Ms. Locke opined, however, that K.M. performed below grade-level expectations, had great difficulty following instruction, could not concentrate at all, and that when compared to other students, her work quality was very poor. (Tr. 394). Ms. Locke noted that K.M. had attendance problems, and was usually absent 2-3 days a week. (Tr. 395). Ms. Locke further noted that K.M. needed to wear glasses. (*Id*.)

Ms. Shelley Stamp, K.M.'s first-grade language arts teacher, also completed a questionnaire in September 2004. (Tr. 396-99). Ms. Stamp reported that when K.M. was not on medication, it was harder for her to follow instructions. (Tr. 396). Ms. Stamp reported that K.M. was friendly, well-liked, and helpful to everyone in her group. (Tr. 397). Further, Ms. Stamp reported that K.M. liked to chat with her group about things other than what she should, but that it was a very minute problem. (*Id*.) Ms. Stamp also stated that K.M took longer to complete assignments and was hard to keep focused, but that she consistently made an effort. (Tr. 398).

In December 2004, Sharon Tucker, K.M.'s special education teacher for language arts, completed a questionnaire wherein she reported that K.M. had a speech or language impairment and a specific learning disability, for which she was in special education. (Tr. 247). Ms. Tucker opined that K.M. had no problems interacting and relating with others, moving about and manipulating objects, or caring for herself. (Tr. 250-56). Ms. Tucker opined that K.M. had some serious problems with acquiring and using information, but

only slight problems with attending and completing tasks, except for completing work accurately without careless mistakes. (Tr. 250-51). Ms. Tucker noted that K.M. had an unusual degree of absenteeism. (Tr. 249).

In January 2005, psychologist John Waddell, PhD. reviewed K.M.'s records at the request of the state DDS, and opined that while K.M.'s impairments were severe, they did not meet, medically equal, or functionally equal a listed impairment. (Tr. 257-58). Dr. Waddell opined that K.M. had no limitations in moving about and manipulating objects, caring for herself, and in her health and physical well being. (Tr. 261-62). Dr. Waddell opined that K.M. had less than marked limitations in acquiring and using information, attending and completing tasks, and interacting and relating with others. (Tr. 261-62). Dr. Waddell noted that K.M. was in the 2nd grade and only received special education services for language arts and math. (Tr. 261). Dr. Waddell reported that K.M.'s ADHD had improved with medication and that her work pace was not significantly impaired at that time. (*Id*.) Further, Dr. Waddell reported that K.M.'s record showed she had friends and that teachers reported no problems with her interacting with peers in the classroom setting. (*Id*.)

In May 2005, Ms. Tucker completed an assessment, wherein she opined that K.M.'s communicative functioning and concentration, persistence or pace were not age-appropriate when compared to the functioning of same-aged children who did not have impairments. (Tr. 264-69). Ms. Tucker reported that K.M. was very distracted during instruction and was often unable to sit still and complete tasks. (Tr. 268). Ms. Tucker

opined that K.M. continued to be very distracted when she was on medication. (*Id*.) She opined, however, that K.M.'s motor and physical functioning, personal functioning, and social functioning were age-appropriate in comparison to the functioning of same-aged children who did not have impairments. (Tr. 264-69). Ms. Tucker noted that K.M. had a learning disability, but that her cognitive functioning was average. (Tr. 264). Ms. Tucker noted that K.M. was "a very friendly young girl who love[d] to tell stories and talk about her friends and family (positively) [and that s]he had a positive attitude toward learning." (Tr. 269).

K.M.'s second grade report card showed that in the first quarter, she made progress in reading and that she did a good job of sounding out unfamiliar words. (Tr. 383). The report card noted that K.M. was a great helper, but struggled in math. (*Id.*) The report card also noted that in the fourth quarter, K.M. put forth very good effort and enjoyed learning, but needed to work on addition and subtraction of multi-digit numbers. (*Id.*)

In May 2005, K.M. was on target with reading and math diagnostics according to cognitive abilities testing. (Tr. 386).

In November 2005, K.M. was seen at the Milford Family Practice in order to become an established patient. (Tr. 379). At the time, K.M. already had a prescription for Adderall. (*Id*.) K.M. was diagnosed with ADHD and given a refill for Adderall. (*Id*.) The physician opined that K.M.'s Adderall prescription seemed consistent with her diagnosis. (*Id*.) K.M. returned in March 2006 and her prescription was refilled. (Tr. 378).

For the 2005-2006 school year, K.M. was placed in special education classes. (Tr. 282-87). In the spring of 2005, K.M. underwent the Ohio Off-Grade Proficiency Tests, which placed K.M. below proficiency standards. (Tr. 321). K.M. was placed in special education classes for the 2006-2007 school year (Tr. 324-330), and received average to below average grades (Tr. 389).

In early 2007, K.M. underwent IQ testing with Raymond Soh, Ph.D. (Tr. 427). At that time, K.M.'s verbal IQ was 79, her performance IQ was 89, and her full scale IQ was 82, which placed her in the low average range. (*Id*.) K.M.'s math fluency and reasoning, spelling, applied problems, and passage comprehension skills scores were at the second grade level (significantly below her peers). (*Id*.) In the social and emotional functioning section, Dr. Soh noted that K.M. was a happy and easy going student, who was kind and generous, and enjoyed going to school and liked working on a computer. (Tr. 428). Dr. Soh opined that K.M. would continue to benefit from special education support, especially in the areas of reading, math, and written expression. (*Id*.)

In January 2007, Ms. Sonia Newbright, an intervention specialist, completed a teacher questionnaire, while K.M. was in the fourth grade. (Tr. 412-17, 432). Ms. Newbright opined that K.M. required instruction that was multiple levels below her grade level and that she needed repetitions of information and assistance with reading and writing. (Tr. 412). Ms. Newbright reported that K.M. needed to work in a small group and at her pace, and needed adult support to stay on tasks and finish assignments. (Tr. 416). Ms. Newbright reported that K.M. had improved but still struggled with reading,

writing, and math. (Tr. 432). Ms. Newbright opined that K.M. was very social and liked to interact with her peers, but that she needed continued work with the appropriate ways to maintain relationships. (Tr. 415). Ms. Newbright reported that K.M. made friends easily and loved to tell stories. (Tr. 432).

Also in January 2007, after a little less than four months of teaching K.M., Ms. Lee Wiss completed a teacher questionnaire, and opined that K.M. was on par with other students her age when it came to communicative functioning, motor and physical functioning, but below average in cognitive functioning, personal functioning, social functioning, and concentration persistence or pace. (Tr. 418- 423).

Ms. Valerie Leonard also completed a teacher questionnaire in January 2007 (Tr. 431, 438-443), and reported that K.M. was very social and did not struggle with social skills (Tr. 431). Ms. Leonard reported that K.M. had made progress in receptive and expressive language, even though this was not necessarily reflected in her test scores. (*Id.*) Ms. Leonard reported that K.M. needed additional time to process and respond to information presented verbally. (*Id.*) Ms. Leonard reported that in order for K.M. to be successful in school, her academic content had to be modified to a degree that was significantly below that of her fourth-grade peers. (Tr. 438). Ms. Leonard reported that K.M. was easily distracted which affected the speed with which she completed assignments. (Tr. 442). K.M. needed directions broken down and reminders to stay on task. (*Id.*)

In early January 2007, K.M. was seen by Theresa Derickson of the Springdale Pediatrics for a six-month follow-up on her attention deficit disorder. (Tr. 453). K.M.'s Adderall prescription was discontinued because Ms. Spurgeon was concerned about a sudden risk of cardiac death based on some news reports she had heard. (Tr. 453-54). Ms. Derickson prescribed a one-month, non-refillable prescription of a lower dose of Adderall. (Tr. 453).

***K.M.'s Administrative Testimony***

K.M. testified that she had a lot of friends, and that she got along with her family. (Tr. 524). She testified that she would sit for a whole movie or an hour cartoon show and watch it, and that she would read a book on her own. (Tr. 525). K.M. testified that she paid attention more when she was on her medication, but that she forgot to take it; however, she never refused to take it. (Tr. 526). She testified that she felt like a normal fourth grader. (Tr. 527).

***Ms. Spurgeon's Administrative Testimony***

Ms. Spurgeon testified that K.M. was in the fourth grade, but that she was learning at a second grade level and was hyperactive. (Tr. 498). She testified that K.M. did not have a behavior problem; and that in fact, she was pretty well-behaved. (Tr. 499). Ms. Spurgeon testified that K.M. managed to get simple things for herself, bathe herself, and clean-up after herself. (Tr. 515). She testified that K.M. did not like to take her medication (Tr. 515), and that her 16 year-old daughter was supposed to give it to her but that she did not take it (Tr. 516). Ms. Spurgeon testified that the medication did make a

difference and that K.M. learned better when taking them. (Tr. 516, 520).

Ms. Spurgeon also testified that K.M. got along well with her family and played with other kids and friends in the neighborhood. (Tr. 516). K.M. rode bikes, jumped ropes, played at the park, swam, and was generally physically active. (Tr. 517-18). Ms. Spurgeon testified that K.M. could watch T.V., play on the computer, or play games for almost an hour each, and that she could sit and watch a movie usually up through the midway point. (Tr. 518-19).

***Independent Medical Expert Testimony***

Dr. Terry Schwartz testified as an independent medical expert at the second administrative hearing. (Tr. 531-545). Dr. Schwartz testified that K.M.'s verbal IQ score was 79, her performance IQ score was 89, and her full scale IQ was 82, which placed her in the low average range of intelligence and which was consistent with her IQ testing from 2004. (Tr. 531-32). Dr. Schwartz testified that K.M.'s ADHD did not meet or medically equal a listing. (Tr. 533). With regard to functional equivalence, Dr. Schwartz testified that K.M.'s ability to acquire and use information was less than marked; her ability to attend and complete tasks was less than marked when she was on her medications; she had no impairment in her social functioning; no impairment in moving about or manipulating objects; her ability to care for herself was less than marked; and she had no limitation with her overall physical health. (Tr. 533-34). Dr. Schwartz testified that K.M.'s scores on the Woodcock-Johnson test were low and showed that K.M. qualified for special education, but that they were commensurate with her low

average intelligence.[2] (Tr. 535-37).

The ALJ found that K.M. had "severe" impairments consisting of a learning disability, speech and language impairment, attention deficit hyperactivity disorder, but that she did not have an impairment or combination of impairments that met or medically equaled the listing. (Tr. 23). The ALJ found that K.M. had less than marked limitations in the following areas: acquiring and using information, attending and completing tasks, and ability to care for herself. Additionally, the ALJ found no limitations in the following areas: interacting and relating to others, moving about and manipulating objects, and health and physical well-being. (Tr. 28-33).

To receive SSI child's benefits, Plaintiff must establish that K.M. has a medically determinable physical or mental impairment, which resulted in "marked and severe functional limitations," and which was expected to result in death or which had lasted or was expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(C)(i); 20 C.F.R. § 416.906. "Marked and severe functional limitations" means a level of severity that meets, medically equals, or functionally equals the Listings. To establish functional equivalence, Plaintiff must have a medically determinable impairment or combination of impairments that results in "marked" limitations in two functional domains or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a).[3]

---

[2] Dr. Schwartz testified that the Woodcock-Johnson test was representative of a person's academic abilities for achievement. (Tr. 532).

[3] The domains represent broad areas of functioning intended to capture all of what a child can or cannot do. 20 C.F.R. § 416.926a(b)(1).

The domains are: (1) acquiring and using information[4]; (2) attending and completing tasks[5]; (3) interacting and relating with others[6]; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R.

---

[4] In this domain, we consider how well you acquire or learn information, and how well you use the information you have learned. When you are old enough to go to elementary and middle school, you should be able to learn to read, write, and do math, and discuss history and science. You will need to use these skills in academic situations to demonstrate what you have learned; e.g., by reading about various subjects and producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work, and entering into class discussions. You will also need to use these skills in daily living situations at home and in the community (e.g., reading street signs, telling time, and making change). You should be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing your own ideas, and by understanding and responding to the opinions of others. 20 CFR 416.926a.

[5] In this domain, we consider how well you are able to focus and maintain your attention, and how well you begin, carry through, and finish your activities, including the pace at which you perform activities and the ease with which you change them. When you are of school age, you should be able to focus your attention in a variety of situations in order to follow directions, remember and organize your school materials, and complete classroom and homework assignments. You should be able to concentrate on details and not make careless mistakes in your work (beyond what would be expected in other children your age who do not have impairments). You should be able to change your activities or routines without distracting yourself or others, and stay on task and in place when appropriate. You should be able to sustain your attention well enough to participate in group sports, read by yourself, and complete family chores. You should also be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation. 20 CFR 416.926a.

[6] Interacting means initiating and responding to exchanges with other people, for practical or social purposes. You interact with others by using facial expressions, gestures, actions, or words. You may interact with another person only once, as when asking a stranger for directions, or many times, as when describing your day at school to your parents. You may interact with people one-at-a-time, as when you are listening to another student in the hallway at school, or in groups, as when you are playing with others. When you enter school, you should be able to develop more lasting friendships with children who are your age. You should begin to understand how to work in groups to create projects and solve problems. You should have an increasing ability to understand another's point of view and to tolerate differences. You should be well able to talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand. 20 CFR 416.926a.

§ 416.926a(b)(1)(i)-(vi).

A "marked" limitation is one which seriously interferes with functioning. 20 C.F.R. § 416.926a(e)(2)(i). "Marked" limitation also means "more than moderate" but "less than extreme." 20 C.F.R. § 416.926a(e)(2)(i). It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. § 416.926a(e)(2)(i).

An "extreme" limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). An "extreme" limitation also means "more than marked." 20 C.F.R. § 416.926a(e)(3)(i). Extreme limitation does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean. § 416.926a(e)(3)(i).

Plaintiff argues that "the ALJ did not adequately review why . . . [K.M.] did not meet or equal a listing" and that the ALJ erred in failing to make proper credibility findings as to school psychologists' and teachers' findings. (Doc. 13 at 7). However, the ALJ detailed her specific findings in a 15-page decision (Tr. 20-34) and reasonably found that K.M.'s impairments did not impose limitations which would functionally equal any listing (Tr. 23-33).

While the medical records established that K.M. had ADHD and a learning disability, among other impairments, the ALJ reasonably found that she was less than

markedly limited in acquiring and using information, less than markedly limited in attending and completing tasks (when using medication), and had no limitations in interacting and relating with others.[7] In making these findings, the ALJ properly considered a host of evidence, including K.M.'s testimony, her mother's testimony, as well as school records, academic testing, K.M.'s psychologist and teachers' opinions, physicians records and treatments, and other evidence.

***1. Acquire and use information***

When considering K.M.'s ability to acquire and use information, the ALJ noted that K.M. had low average intelligence, had passed all grades, except the first grade, and was in regular classes, except for reading, math, and writing. (Tr. 29, 296, 428, 498). The ALJ further noted that K.M. went to speech therapy for only about 20 minutes every day. (Tr. 29, 523). In addition, the ALJ looked to the ME and Drs. Stinson's and Waddell's opinions that K.M. had only less than marked limitations in acquiring and using information. (Tr. 222, 261). The record further demonstrates that K.M.'s special education teacher, Ms. Khanna, opined that K.M. usually adjusted well to new situations or criticism. (Tr. 293). Ms. Newbright, K.M.'s intervention specialist, reported that K.M.'s reading and writing had improved, although she still struggled with reading, writing, and math. (Tr. 432). Ms. Newbright also opined that K.M. was successful with using the resources around her to help her complete what is

---

[7] As previously noted, the ALJ made findings that K.M. had less than marked limitations or no limitations in the other three domains. (Tr. 28-33). Plaintiff does not challenge the ALJ's findings regarding the other domains; and, therefore, the undersigned addresses only the three domains at issue. (Doc. 13 at 10).

asked of her. (Tr. 432). In addition, when tested in May 2005, K.M. was on target with reading and math diagnostics according to cognitive abilities testing (Tr. 386), and she had a full scale IQ score of 82[8] in early 2007. (Tr. 427). In light of this evidence, the ALJ could reasonably find that K.M. had less than marked limitations in her ability to acquire and use information.

Dr. Stinson noted, for example, that K.M. was doing better with acquiring and using information since starting medication. (Tr. 222). Dr. Waddell noted that K.M. was only in special education for language arts and math. (Tr. 261). Dr. Waddell further noted that K.M.'s ADHD had improved with medication, that her work pace was not significantly impaired, and that she had no problems interacting with her peers. (Tr. 261). These highly qualified medical source opinions support the ALJ's finding that K.M. had less than marked limitations in functioning. *See Kelly v. Comm'r of Soc. Sec.*, No. 07-5897, 2009 WL 33266 (6th Cir. Feb. 2, 2009) ("[T]he regulation [20 C.F.R. § 416.926a(h)(3)] cautions that just because a person has the limitations described does not mean the person has an extreme or even a marked impairment.").

Plaintiff argues that the ME ignored school psychologists' opinions, teachers' questionnaires, and other test results, which would establish marked limitations in acquiring and using information. (Doc. 13 at 7-10). However, it is clear from the decision that the ALJ considered all of the assessments, and relied on several different

---

[8] An IQ under 70 is generally considered the benchmark for "mental retardation." An IQ of 80-89 is considered low average and 16.1% of the population is classified in this range.

types of evidence, including K.M.'s own testimony, her mother's testimony, school testings, teachers' reports, medical source opinions, and school records. (Tr. 23-33). *See Kasberger v. Astrue*, No. 06-3868, 2007 WL 1849450, at *3 (7th Cir. June 2007) ("The ALJ did exactly what she was supposed to do when presented with competing medical evidence: she evaluated it and favored the more persuasive evidence.").

Further, Plaintiff argues that the ALJ ignored the fact that K.M. was functioning two or three grade levels below her appropriate age grade level.[9] (Doc. 13 at 7). While K.M.'s test results demonstrated that she had delays in math, spelling, and reading, consistent with her learning disability, K.M.'s test scores were not two standard deviations below the mean. 20 C.F.R. § 416.926a(e)(2) (explaining that a marked limitation is the equivalent of functioning found on standardized testing with scores that are at least two, but less than three, standard deviations below the mean). Even if the undersigned were to find that Plaintiff was functioning two standard deviations below the mean, and had marked limitations in acquiring and using information, such a finding would be irrelevant because substantial evidence supports the finding that K.M. does not have marked limitations in *two* functional domains.

---

[9] Ms. Locke reported that Plaintiff was in a replacement class of six students and was still below grade level. (Tr. 392). Special Education Teacher, Shashi Khanna, opined that K.M. needed redirection even in the small group setting and worked at a slower pace. (Tr. 294). Ms. Stamp noted that K.M. was not functioning independently, needed continuous review of letter recognition, sounds, sights words skills and strategies had to be practiced over and over. (Tr. 398). In January 2007, Sonia Newbright, Intervention Specialist, opined that K.M. required instruction that was multiple levels below her grade level. (Tr. 412). Valerie Leonard, M.S. CCC/SLP added that the K.M.'s academic content was significantly modified below that of her fourth grade peers. (Tr. 438). However, she also stated that K.M. had made progress in receptive and expressive language even though this was not necessarily reflected in her test scores. (Tr. 431).

Plaintiff also argues that the ALJ should have contacted Dr. Soh and asked for clarification and/or explanation concerning the discrepancy in test scores.[10] However, the amount of evidence to gather is a determination which is left up to the ALJ. *See Kendrick v. Sec'y of Health & Human Servs.*, 998 F.2d 455, 458 (7th Cir.1993) ("How much evidence to gather is a subject on which district courts must respect the Secretary's reasoned judgment."). K.M.'s testing was only part of the analysis, and it was performed so that the school could confirm that K.M. would continue to benefit from special education support, especially in the areas of reading, math, and written expression. (Tr. 428).

***2. Attending and completing tasks***

Similarly, the ALJ reasonably found that K.M. had less than marked limitation in attending and completing tasks. (Tr. 30). In making this finding, the ALJ considered K.M.'s need to work in small groups, need for extra time, and need to work at her own pace, but also considered that several of K.M.'s teachers opined that K.M. had improved in her concentration, attending, and completing of tasks, and that her attention span and her progress had improved as well. (Tr. 30, 193, 210-11, 292). Ms. Endres opined that K.M.'s attention deficit had improved since she was started on medication (Tr. 296), and Ms. Glaser reported that K.M.'s ADHD was much better with medications. (Tr. 302). Likewise, Ms. Stamp noted that when K.M. was not on

---

[10] In 2007, school psychologist Dr. Raymond Soh showed the following results: Grade equivalent in Math 1.4, applied problems 2.1, Spelling 1.8, and passage comprehension 1.5. (Tr. 427). K.M. was in the fourth grade but only able to perform at a second grade level. (*Id*.) Dr. Soh opined that the K.M.'s oral reading fluency was only 22 words correct per minute, but she should read at 110 words correct per minute. (*Id*.)

medication, it was harder for her to follow along with the lessons, took longer for her to complete assignments, and was harder for her to keep focused, but noted that she consistently made an effort to try. (Tr. 396-98). K.M.'s treating physician, Dr. Blakenburg, also reported that K.M. did well when she was on medication and that the difference was really noticeable. (Tr. 227, 229). Even K.M. testified that she paid attention more when she was on her medication. (Tr. 526). This evidence, in conjunction with the ME and Drs. Stinson's and Waddell's opinions support the ALJ's finding that while K.M. had some limitations in attending and completing tasks, they were less than marked. (Tr. 222-23, 261-62, 533-34).

Plaintiff argues that the ALJ placed too much emphasis on reports that K.M. improved with medication,[11] and ignored reports that she continued to struggle with her learning disability even on medication.[12] (Doc. 13 at 11). While the ALJ acknowledged that K.M. still struggled while on medication, substantial evidence, including her own testimony and her treating physician's and teachers' opinions, show that she improved while on medication.

---

[11] How well a child can initiate, sustain, and complete activities depends in part on the amount of supervision, extra help, and even the medications that the child receives that enable her to participate in the activities. 20 CFR § 216.924a(b)(5)(ii).

[12] Plaintiff claims that K.M.'s medication is a non-issue. In 2004, Dr. Amy Glaser noted that the K.M. had begun medication for ADD but continued to work significantly below grade level. (Tr. 193). Teacher Kathy Locke noted that K.M. was put on meds for ADD and was doing better, but still having problems. (Tr. 210). Sharon Tucker, K.M.'s special education teacher, stated that K.M. took Adderall daily, but continued to be very distracted during instruction and was often unable to sit still or complete tasks. (Tr. 268). Special education teacher, Ms. Shashi Khanna, opined that medication seemed to help, but K.M. still had difficulty following multi-step directions, and steps had to be broken down. (Tr. 292). Dr. Glasser, the school psychologist, reported that K.M. sometimes needed repetition; re-explanation prior to being prescribed medication for ADHD, but the quality of work compared to students in same age group is below expectation. (Tr. 302). Additionally, K.M.'s mother testified that K.M. always took her medications regularly, except that in the few months prior to the hearing, K.M. missed her medications 50% of the time. (Tr. 522).

### *3. Interacting and relating to others*

Finally, the ALJ reasonably found that K.M. had no limitation in interacting and relating to others. (Tr. 31). K.M.'s teachers reported that K.M. was very friendly, good natured, and had no significant problems interacting with her peers. (*Id*.) For example, Ms. Tucker noted that K.M. was "a very friendly young girl who love[d] to tell stories and talk about her friends and family (positively) [and that s]he had a positive attitude toward learning." (Tr. 269). Ms. Stamp reported that K.M. was friendly, well-liked, and helpful to everyone in her group. (Tr. 397). Further, while Ms. Stamp reported that K.M. liked to chat with her group about things other than what she should, she reported that this was a very minute problem. (*Id*.) Ms. Glaser reported that K.M. did not have any significant problems interacting with peers or establishing and maintaining personal friendships. (Tr. 301). In addition, Ms. Khanna opined that K.M. was very friendly and eager to please others, got along well with peers, and did not have problems working with others in small group settings. (Tr. 293). Ms. Newbright opined that K.M. made friends easily and worked to continue those relationships. (Tr. 432). Ms. Locke reported that K.M. was a very loving child and related well to others. (Tr. 393). In addition, Ms. Endres opined that K.M. interacted appropriately in small group settings. (Tr. 297-298). Also, K.M.'s mother testified that she had friends in the neighborhood and at school, and that she got along well with her family. (Tr. 31, 516). K.M. reported that she had friends at school and

at home. (Tr. 31, 524). Based on this evidence, it was entirely reasonable for the ALJ to find that K.M. had no limitation in interacting and relating to others. (Tr. 31).

In addition to the above evidence, the ALJ's decision is supported by Drs. Stinson's and Waddell's opinions. These doctors reviewed K.M.'s records and opined that she had less than marked limitations in interacting and relating with others. (Tr. 222-23, 261-62). *See* 20 C.F.R. § 416.927(f)(2)(i) (explaining that state agency physicians are highly qualified physicians who are also experts in social security disability evaluation); *see also* SSR 96-6p, 61 Fed. Reg. 34466 (1996) (explaining that the opinion of a state agency consultant may be entitled to greater weight than a treating source).

While Plaintiff may disagree with the ALJ's decision, her decision is clearly within the "zone of choices" afforded to her. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) ("The substantial evidence standard allows considerable latitude to administrative decision makers. It presupposes that there is a zone of choice within which the decision makers can go either way, without interference."). The issue is not whether the record could support a finding of disability, but rather whether the ALJ's decision is supported by substantial evidence. *See Casey v. Sec'y of Health & Human Servs*., 987 F.2d 1230, 1233 (6th Cir. 1993). Accordingly, the undersigned finds that the ALJ's decision is supported by substantial evidence.

## III.

For the foregoing reasons, Plaintiff's assignments of error are unavailing. The ALJ's decision is supported by substantial evidence and should be affirmed.

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner, that K.M. was not entitled to supplemental security income, be found **SUPPORTED BY SUBSTANTIAL EVIDENCE**, and **AFFIRMED**; and, as no further matters remain pending for the Court's review, this case be **CLOSED.**

Date: April 12, 2010

s/ Timothy S. Black
Timothy S. Black
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| WENDY A. SPURGEON, Natural Mother on Behalf of K.M., a Minor, | : | Case No. 1:09-cv-430 |
| Plaintiff, | : | Chief Judge Susan J. Dlott<br>Magistrate Judge Timothy S. Black |
| vs. | : | |
| COMMISSIONER OF SOCIAL SECURITY, | : | |
| Defendant. | : | |

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN DAYS** after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within **FOURTEEN DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).